**MICHIGAN REGION COUNCIL OF CARPENTERS EMPLOYEE BENEFITS FUND, et al., Plaintiff,**

v.

**HOLCROFT, L.L.C., Defendant.**

No. 00–73803.

United States District Court, E.D. Michigan, Southern Division.

July 31, 2001.

Altman, Vercruysse, Metz, Bingham Farms, MI, for defendants.

## OPINION AND ORDER GRANTING SUMMARY JUDGMENT TO DEFENDANTS AND DENYING IT TO PLAINTIFFS

ROBERTS, District Judge.

### I. INTRODUCTION

Before the Court are cross Motions for Summary Judgment. This dispute arises out of provisions set forth in the Worker Adjustment and Restraining Notification Act (WARN Act). Plaintiff, a union organization acting on behalf of its members, who were formerly employed by the Defendants, contends that the WARN Act was violated because of the sudden closure of a manufacturing plant, the mass layoff of employees, and the termination of employees. Each of these events allegedly occurred without any notice to the employees (i.e., 3–5 days notice), and Plaintiff maintains that these events have had a devastating effect upon the financial well being of the workers, their family and their communities.

Defendants assert that they are entitled to summary judgment because the above set forth series of events, which Defendants do not completely agree to be accurate, do not constitute WARN Act violations.

For the reasons stated below, Plaintiff's Motion for Summary Judgment is **DENIED**. Defendants' Motion for Summary Judgment is **GRANTED**.

### II. BACKGROUND

#### A. The Parties

Plaintiff, Michigan Regional Council of Carpenters ("Union"), is a labor union organization, acting on behalf of its members who were formerly employed by the De-

Lynn F. McGuire, Novara, Tesija, Southfield, MI, for plaintiffs.

James M. Gecker, Katten, Muchin, Chicago, IL, Gregory V. Murray, William E.

fendants. Defendant, Madison Capital Partners (Madison Capital), a private equity firm that invests in middle market companies, purchased Defendant, Holcroft, L.L.C. ("Holcroft") in 1997 in order to acquire from Thermo TerraTech Inc. the assets of its heat-treating furnace business, including the trade name, Holcroft, and to oversee various aspects of Holcroft's business of operations.

Holcroft designed, manufactured and serviced heat-treating furnaces for the automotive industry and other industrial uses. Holcroft operated a manufacturing plant in Livonia, Michigan, where it employed hourly production workers represented by Plaintiff. Holcroft also employed non-union salaried workers such as engineers, sales staff, and financial and administrative personnel.

It is undisputed that in January 2000, discussions were initiated with several companies in the heat-treating furnace industry regarding the possible sale of Holcroft. By late January, it appeared that Atmosphere Furnace Company and its affiliate, Defendant, Atmosphere Group (collectively, Atmosphere), located in Wixom, Michigan, was the most serious of the potential buyers. Following the negotiation with Atmosphere in January and February, Atmosphere signed a Letter of Intent memorializing Atmosphere's conditional intention to acquire the assets of Holcroft. On March 29, 2000, Atmosphere entered into a binding agreement whereby Holcroft would sell substantially all of its assets to Defendant, AFC–Holcroft, L.L.C., a newly created subsidiary of Atmosphere.

## B. Statement of Facts

Prior to the sale of assets, several hourly employees were laid off. On April 23, 1999, May 5, 1999, May 11, 1999, May 20, 1999 and on October 1, 1999, Holcroft solicited voluntary layoffs from its hourly employees. *(See Exhibits 6–10 of Plaintiff's Motion for Summary Judgment—Interoffice Memoranda).*

Based upon the Court's review of the papers and supporting documents submitted by the parties, the chart below reflects the layoffs, recalls and resignations which have occurred.

| Effec. Layoff | # of Vol. Layoffs | # of Invol. Layoffs | # of Recalls | Dis. Leave | Resign |
|---|---|---|---|---|---|
| 10/1/99 [1] | 2 | | | | |
| 10/8/99 [2] | 1 | | | 3 [3] | |

| Effec. Layoff | # of Vol. Layoffs | # of Invol. Layoffs | # of Recalls & Date | Dis. Leave | Resign |
|---|---|---|---|---|---|
| 10/8/99 [4] | | 9 | | | |
| 11/17/99 [5] | | 7 | | | |
| 11/19/99 [6] | | 15 | | | |

1. *See Exhibits A and 4 of Defendant's Motion for Summary Judgment*

2. *See Exhibit 11 of Plaintiff's Motion for Summary Judgment*

3. It is noted on the bottom of the October 6, 1999 Layoff Notice and the November 17, 1999 Layoff Notice that "[u]pon return to work from Medical Leave, if a recall has not been initiated, Michael Sturtz and Miroslav Brzozka will also be laid off." Mr. Sturtz returned to work and was subsequently laid off on January 4, 2000. Mr. Brzozka, Victor Guerreso and Coy Lentz who were on disability leave at the time of their layoff which was on March 31, 2000. *(See Exhibit A of Defendants' Motion for Summary Judgment, ¶¶ 12, 20)*

4. *See Exhibit 2 of Defendant's Motion for Summary Judgment*

5. *See Exhibit 5 of Defendant's Motion for Summary Judgment*

6. The Layoff Notice lists 15 individuals. However, in Robert E. Spencer's (President and CEO of Holcroft from 8/98—10/00) Declaration, he states that 14 employees were laid off effective 11/19/99; and on 11/22/99, another employee, Lev Orlov, was laid off. *(See Exhibit A of Defendants' Motion for Summary Judgment).*

| Effec. Layoff | # of Vol. Layoffs | # of Invol. Layoffs | # of Recalls | Dis. Leave | Resign |
|---|---|---|---|---|---|
| 11/22/99 [7] | | 1 | | | |
| 1/3/00 [8] | | | 1 | | |
| 1/4/00 [9] | | | 1 | 1 | |
| 2/28/00 [10] | | 10 | | | |
| 2/25/00 [11] | | | 2 [12] | | |
| 3/31/00 [13] | | 35 | | | |
| 4/3/00 [14] | 2 | | | | |
| 4/4/00 [15] | | | 1 [16] | | |
| 4/4/00 [17] | | | 5 [18] | | |
| 5/7/00 [19] | | | 2 | | |

| Effec. Layoff | # of Vol. Layoffs | # of Invol. Layoffs | # of Recalls | Dis. Leave | Resign |
|---|---|---|---|---|---|
| 4/12/00 [20] | | | 1 [21] | | |
| 6/7/00 [22] | | | 2 [23] | | |
| 6/7/00 [24] | 1 | | | | |
| 6/15/00 [25] | | | | | 1 |

7. Thomas Spicer (Manufacturing Supervisor) (duplicate layoff from 10/8/99 and 11/17/99)

8. *See Exhibit A of Defendant's Motion for Summary Judgment, ¶ 9*

9. *See Exhibit A of Defendant's Motion for Summary Judgment, ¶ 12*

10. *See Exhibit A of Defendant's Motion for Summary Judgment, ¶ 9 and Exhibit 9 of Defendant's Motion for Summary Judgment*

11. *See Exhibit A of Defendant's Motion for Summary Judgment, ¶ 15 and Exhibits 10 & 11 of Defendant's Motion for Summary Judgment*

12. John Barrett & Lucian Ona—Both declined to return. *(See Exhibit A ¶ 15 and Exhibits 10 & 11 of Defendants' Motion for Summary Judgment)*

13. Thirty-five individuals are listed on the Layoff Notice as acknowledged by Plaintiff. However, Defendant states that there were only thirty employees laid off effective 3/31/00. After sifting through all of the inter-office exhibits and affidavits, it appears that thirty-five is the accurate number. Of the thirty-five individuals who were laid off, five of them were recalled (Andrew Timson, Arthur Klein, Carl Martin, Bob Bayer and Roger Minton). Of those five, two voluntarily left (Bob Bayer and Roger Minton). Each of these individuals' comings and goings are noted in the chart, so they should not be subtracted from the thirty-five number of employees on the Layoff Notice because they were subsequently called back. *(See Exhibit B of Defendant's Motion for Summary Judgment, ¶ 6)*

14. Thomas Biro *(See Exhibit 13 of Defendant's Motion for Summary Judgment)* and Roger Minton *(See Exhibit A ¶ 25 and Exhibit 17 of Defendant's Motion for Summary Judgment).*

15. *See Exhibit 14 of Defendants' Motion for Summary Judgment*

16. Carl Martin

17. *See Exhibit 14 of Defendants' Motion for Summary Judgment)*

18. The 5 employees declined to return. *(See Exhibit 14 of Defendants' Motion for Summary Judgment)*

19. *See Exhibit B of Defendant's Motion for Summary Judgment, ¶ 6a & b*

20. *See Exhibit A of Defendant's Motion for Summary Judgment, ¶ 23a*

21. Bob Bayer was one of the employees who declined recall on 4/4/00. He accepted recall on 4/12/00. However, effective June 15, 2000, Mr. Bayer voluntarily terminated his employment to take another position.

22. *See Exhibit A of Defendant's Motion for Summary Judgment, ¶ 24 and Exhibit 16 of Defendants' Motion for Summary Judgment*

23. Carl Martin

24. Roger Minton was included in the 3/31/00 layoff, but was recalled on 4/3/00. However, he requested an indefinite voluntary layoff effective 6/7/00 *(See Exhibit 17 of Defendant's Motion for Summary Judgment).*

25. *See Exhibit A of Defendant's Motion for Summary Judgment, ¶ 23a and Exhibit 15 of Defendant's Motion for summary Judgment*

| | |
|---|---|
| 7/7/00 [26] | 7 |
| 8/15/00 [27] | 1 |
| 9/26/00 [28] | 1 |
| 10/13/00 [29] | 1 |

During the first part of 2000, in an attempt to avoid further layoffs and/or terminations, the Union and its members agreed to a brief temporary reduction in the number of hours in the standard work week (i.e., 32 hours). Subsequent to the February 28, 2000 layoffs, Holcroft sent a letter to all of the employees that it had laid off on various dates in October and November of 1999, stating "[w]hile we assume that you have understood for some time that a recall is highly unlikely, we want to let you know that we do not foresee any possibility of recall in the future." *(See Exhibit 18.1 & 18.31 of Plaintiff's Motion for Summary Judgment).* On March 8, 2000, this same message was conveyed to the single employee who had been laid off on January 4, 2000 *(See footnote 3).*

Although the layoffs detailed above are for the most part undisputed as indicated in the footnoted material to the above chart, there is a point of contention about the reasoning and the timing of the layoffs.

Defendants maintain that any layoffs that occurred prior to March 31, 2000 were as a result of a downturn or lack of production of work. Layoffs occurring on or after March 31, 2000 were related to the sale of Holcroft to Atmosphere. Plaintiff infers that all of the layoffs were as a result of the sale, based upon the business activity taking place prior to the actual sale of Holcroft assets. There is also a dispute about the time frame within which a certain number of employees were laid

off. (i.e., aggregating layoffs or "employment losses" occurring within ninety days prior to or following the sale of Holcroft). Plaintiff claims that within a year and a half, the manufacturing workforce at Holcroft went from 105 unionized employees to zero, and that eighty-four people were laid off between October 1999 and July 2000. Defendant alleges that less than fifty employees were laid off within the ninety days prior to March 31, 2000, and, therefore, Defendants had no duty to give the employees 60 days notice as required under WARN. 29 U.S.C. § 2102(a)(1994).

## III. *STANDARD OF REVIEW*

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R.Civ.P. 56(c); See also Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs. Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994).

"The trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them." *Gallo,* 22 F.3d at 1224. Its duty, in short, "is confined at this point to issue-finding; it does not extend to issue resolution." *Id.* The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the ab-

---

**26.** *See Exhibit 18 of Defendant's Motion for Summary Judgment*

**27.** *See Exhibit B of Defendant's Motion for Summary Judgment,* ¶ 6c

**28.** *See Exhibit B of Defendant's Motion for Summary Judgment,* ¶ 6d

**29.** *See Exhibit B of Defendant's Motion for Summary Judgment,* ¶ 6e

sence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. The substantive law governing the case will identify those facts which are material and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) *(citing United States v. Diebold,* Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); *See also, Gallo,* 22 F.3d at 1223. If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P. 56(e).* "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Inc., supra,* 475 U.S. at 586, 106 S.Ct. 1348. With respect to the issues on which summary judgment is sought, if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir.1994).

## IV. *APPLICABLE LAW & ANALYSIS*

### 1. Number of Employees Who Suffered an "Employment Loss" Within Ninety Days Prior to or Following Holcroft's Sale of Assets

In order to trigger the notice requirement under 29 U.S.C. § 2101(a)(2) of the WARN Act, if the employer lays off fewer than 500 employees in an action unrelated to a plant closing, the number of employees laid off must exceed 50 and must also exceed 33% of the total number of employees. Department of Labor regulations governing WARN enforcement require that these figures be calculated at a "snapshot" date, the date the notice is first required to be given. *C.F.R. § 639.5(a)(2) (1999).* Even where the number of layoffs does not exceed both 50 or 33% of the total number of employees, however, layoffs [or terminations] occurring in separate reduction actions may be aggregated into a "mass layoff" if each set of layoffs involves fewer workers than required by the two statutory thresholds and all layoffs occur within the same 90 day period. *See, 29 U.S.C. § 2102(d).* Where this is the case, the employer will be liable under WARN for failure to notify "unless [it] demonstrates that the employment losses are the result of separate and distinct actions and causes and are not an attempt by the employer to evade the requirements". *Id.*

In this case, neither party states exactly how many employees worked at Holcroft prior to the series of layoffs. Plaintiffs give an estimate of anywhere between 90 and 105. *(See Plaintiff's Motion for Summary Judgment, pg. 6 and Exhibit 25 of Plaintiff's Motion for Summary Judgment).* Since the total number of employees according to Plaintiff and undisputed by Defendants is less than 500, in order for WARN to be triggered, the number of lay offs must exceed 33% of the total number of employees and exceed 50 employees.

In order for WARN to have any applicability in this case, the first point that must be determined is how many of the subject employees suffered "employment loss" and within what time frame. "Employment loss" is defined as an employment termi-

nation (other than discharge for cause, voluntary departure, or retirement), a layoff in excess of six months, or a reduction in hours of work of more than fifty percent during each month of any sixth month period. § 2101(a)(6). The rest of the analysis depends upon the resolution of this issue.

Under § 2101(a)(3) of the WARN Act, in order for its provisions to be triggered the number of employees suffering from "employment loss" must take place at one site of employment, within a 30 day period, and the number of employees must exceed 33% and at least 50 employees. Clearly, based upon the charted layoffs, there was never an instance where 33% and at least 50 employees suffered "employment loss" at one time or within 30 days of each other. However, the WARN Act has an aggregation rule, where "employment losses" occurring within 90 days of each other will be added together to determine if a "plant closing" or "mass layoff" occurred. § 2102(d).

■ In order for Plaintiff to survive Defendant's Motion for Summary Judgment it must demonstrate a genuine issue of fact that at least 50 of the subject layoffs should be aggregated. Plaintiff concedes that the "layoffs" that took place in October and November 1999 do not come under the definition of "employment losses" and that they should not be aggregated with the layoffs. *(See Plaintiff's Response to Defendants' Motion for Summary Judgment, pp. 3–4).* However, Plaintiff argues that since Holcroft sent a letter, dated February 28, 2000, to the individuals who were laid off in 1999, stating, that "[w]hile we assume that you have understood for some time that a recall is highly unlikely, we wanted to let you know that we do not foresee any possibility of recall in the future," this constituted a "termination" and now should be realized as "employment losses." *(See Exhibits 15 & 18*

*of Plaintiff's Motion for Summary Judgment).* As a matter of law and based upon the record, this Court finds that argument unpersuasive for several reasons.

First, *Rifkin v. McDonnell Douglas Corporation,* 78 F.3d 1277 (8th Cir.1996) held: "the fact that the layoff was merely 'expected to be permanent' as opposed to a termination left open the possibility of a rehire and thus weighs against classifying this situation as an employment termination." *Rifkin, supra at 1282.* The Sixth Circuit has agreed with *Rifkin* in holding that "where the termination is at best technical, they have found no WARN violation." *Wiltz v. M/G Transport Services, Inc.,* 128 F.3d 957, 964 (6th Cir.1997). There is additional support for Defendants' position in the Ninth Circuit in *Marques v. Telles Ranch, Inc.,* 131 F.3d 1331, 1334 (9th Cir.1997) where the court held "[l]oss of the expectation of recall cannot be considered an immediate employment loss." Finally, in *United Mine Workers of America, Dist. 2 v. Helen Mining Co.,* Civ. A. No. 93–1131, 1994 WL 287611, at 8–9 (W.D.Pa. April, 18 1994), the court held that employees laid off in November 1992 and January 1993 did not suffer employment losses based on the company's notice to them, in February 1993 that the mine would be shut down in April. Like the February 28th letters in this case, the letter in *Helen Mining* did not affect the employees' employment, but rather their expectation of recall.

Similarly, in this case, the fact that a recall was "highly unlikely" and not foreseen as a possibility in the future does not equate with termination of employment. Such letter was an update to the employees of the status of their employment possibilities with the company. The *Rifkin* court further held that "[a] common sense reading of the statute indicates it is the actuality of a termination which controls

and not the expectations of the employees." *Rifkin,* 78 F.3d at 1282. "An employee cannot be defined as 'terminated if he or she is, in fact, rehired in the same position.'" *Id.* This leads to the second reason why Plaintiff cannot prevail as a matter of law.

Dmitriey Milfer was one of the employees who was laid off by Holcroft in November 1999 and who received the February 28, 2000 letter regarding the unlikelihood of recall. *(See Exhibit 1 of Plaintiff's Response to Defendants' Motion for Summary Judgment).* However, Mr. Milfer began working again for AFC–Holcroft on October 13, 2000 on a contract basis. *(See Exhibit B of Defendant's Motion for Summary Judgment).*

Additionally, Ronald Dallenbach, who was laid off in November 1999, is another employee who received the February 28, 2000 letter. *(See Exhibit 1 of Plaintiff's Response to Defendants' Motion for Summary Judgment)* He also began working for AFC–Holcroft on September 26, 2000, was hired as a regular employee on February 26, 2001 and currently works as a full time employee. *(See Exhibit B of Defendant's Motion for Summary Judgment).* Mr. Milfer and Mr. Dallenbach's employment at AFL–Holcroft is a prime example of the fact that the February 28th letter was not equivalent to a notice of employment termination. Moreover, the Supplemental Declaration by Robert Spencer, CEO of Holcroft from August 1998 until October 2000, confirms the fact that it was not the intent of Holcroft to terminate the employees who were sent the February 28th letter and further sets forth the procedure and protocol exercised by Holcroft when its intent is to terminate an employee. The protocol was not followed here. *(See Exhibit E of Defendants' Response to Plaintiff's Motion for Summary Judgment).*

Third, Plaintiff admits in its Stipulation of Facts that the effective dates of the layoffs were also the dates of "employment loss." *(See Exhibit 19 of Defendant's Motion for Summary Judgment).* Therefore, Plaintiff admits that nine employees suffered "employment loss" on that date. *Id.* at ¶ *2a.* Plaintiff admits that seven employees suffered "employment loss" on November 17, 1999. *Id.* at ¶ *2b.* Plaintiff admits that fifteen employees suffered an "employment loss" on November 19, 1999. *Id.* at ¶ *2c.* Plaintiff admits that one employee suffered an "employment loss" on November 22, 1999. *Id.* at ¶ *2d.* Therefore, Plaintiff admits and acknowledges that the effective layoff date is also the effective "employment loss." This is the correct interpretation of the law.

This Circuit has consistently held that application of the aggregation rules is done by considering only layoffs that commenced within a 90 day window. In *Oil Chemical & Atomic Workers Int'l Union v. RMI Titanium Co.,* 199 F.3d 881, 883–884 (6th Cir.2000), the court held that "layoffs occurring in separate reduction actions may be aggregated into a 'mass layoff' if each set of layoffs involves fewer workers than required by the two statutory thresholds and all layoffs occur within the same 90–day period." Moreover, in affirming the district court's holding that WARN was not triggered, the Sixth Circuit concluded:

> We agree with the district court that there is no genuine issue of material fact that RMI terminated 87 employees within the 90–day period beginning July 22, 1991, and that only these layoffs may be counted toward triggering the 33 percent threshold for purposes of WARN's advance notification provision.

*Id.* at 885. Thus, the Sixth Circuit plainly regards "employment losses" as occurring

at the commencement of a layoff period. In *United Automobile Aerospace & Agricultural Implement Workers v. Shadyside Stamping Corp.*, No. C–2–89–0429, 1991 WL 340191 (S.D.Ohio Feb.8, 1991), *aff'd*, 947 F.2d 946, 1991 WL 230841 (1991), the court likewise treated laid off workers as having suffered an "employment loss" at the commencement of the layoff, refusing to aggregate a layoff that commenced one day prior to the effective date of the statute. *Id. at *2.*

Plaintiff relies upon the Final Rules, cited at 54 Fed.Reg. 16,042 (April 20, 1989) and attached as Exhibit 3 to its Response to Defendants' Motion for Summary Judgment, to support its position that an "employment loss" commencement date can be some time other than the layoff effective date. The Final Rules are the Department of Labor's supplementary information on WARN. However, Plaintiff's reliance is misplaced because the Final Rules clearly state: "[s]ince an employment loss begins with the layoff and since notice is due 60 days in advance, a prudent employer wishing to avoid potential liability would provide notice to the workers at least 60 days prior to their layoff unless it is certain that the layoff will not exceed 6 months." *54 Fed.Reg. 26,042 at 16,049.* Moreover, the Final Rules state that "[a] layoff extending beyond 6 months for any other reasons is treated as an employment loss from the date of its commencement." *Id.*

Based upon the foregoing case law, the effective layoff date is also the commencement date for the subject employees' "employment loss;" and, therefore, the employment loss date cannot be moved back approximately four months (i.e., February 28, 2000) for purposes of bringing those 1999 layoffs within the 90–day window of the March 31, 2000 layoffs where thirty-five employees were laid off at one time.

■ Fourth, WARN provides that "employment losses" for two or more groups may be aggregated within any 90–day period "unless the employer demonstrates that the employment losses are the result of separate and distinct actions and causes," not an attempt to evade the requirement of the Act. *§ 2102(d).* Thus, even assuming the October and November 1999 layoffs had occurred within 90 days of the March 31 layoffs, the evidence shows that they cannot be aggregated under WARN because the undisputed facts demonstrate that they were based on separate and distinct causes.

The Court finds adequate support for Defendants' position that the March 31, 2000 layoffs were due to Holcroft's sale of its business to Atmosphere, and that the 1999 layoffs were due to a lack of production work created by Holcroft's completion of two large manufacturing projects (the Burgess Norton and Brenco contracts) and its failure to secure several anticipated manufacturing contracts which did not materialize (ZF Batavia, Delphi Saginaw and General Motors Power Train). *(See Exhibit A of Defendant's Motion for Summary Judgment, ¶ 7).* This evidence is not opposed by Plaintiff.

In Plaintiff's Brief in Support of Motion for Summary Judgment, pg. 3, it acknowledges that prior to the sale of assets, Holcroft and Madison Capital began to cut back the active work force through a series of layoffs. "In the first part of 1999 Holcroft advised the Union that Holcroft was experiencing a temporary lull in the flow of work through its operation." Plaintiff does not dispute the Defendants' reasons for the series of 1999 layoffs. From an inferential reading of Plaintiff's Brief, it appears that perhaps it would like the Court to determine that since Madison Capital's purchase of Holcroft in October 1997, it had been planning this eventual

onslaught of layoffs and that somehow all of these layoffs are in fact related to the ultimate sale of Holcroft's assets. However, the Court cannot make such an inference, nor do the facts support such an assumption.

In *RMI Titanium*, the Sixth Circuit refused to aggregate employment losses resulting from the failure of a project co-sponsor to pay a share of its expenses with employment losses caused by a general decline in sales. *RMI Titanium*, 199 F.3d at 884–85. Further, in *Shadyside Stamping*, the court held that the cancellation of work by different customers constituted "separate and distinct" causes precluding aggregation. *Shadyside Stamping*, 1991 WL 230841, *2. Thus, the approach of this Circuit is to aggregate employment losses only when they are attributable to precisely the same cause.

Plaintiff has offered no facts to rebut Defendants' showing that the 1999 layoffs were due to a downturn in work production and failure to receive anticipated orders. Consequently, aggregation of the 1999 layoffs with the March 31, 2000 layoffs would be improper.

The Court thus finds that aggregation is inappropriate under the factual circumstances presented and that the 1999 layoffs cannot be added to the March 31, 2000 layoffs.

Plaintiff also argues that "employment losses" can be met by aggregating recalled employees who accepted or declined employment; the employees who took a voluntary layoff; the employees who resigned, and, employees who were on disability. The Court disagrees.

a. **Recalled Employees (Accepted or Declined)**

▮▮▮ Because an "employment loss" is defined as a "layoff exceeding 6 months," any employee recalled within 6 months does not suffer an employment loss. *Rifkin*, 78 F.3d at 1282.

According to the charted layoffs above, there was: (1) one recall (Thomas Spicer) from a November 17, 1999 layoff on January 3, 2000 (2 months); (2) two declined recalls (John Barrett and Lucian Oana) from the February 28, 2000 layoff (0 months as the recall took place three days before the effective date of the layoff); (3) one recall (Carl Martin) from the March 31, 2000 layoff on April 4, 2000 (4 days); (4) five declined recalls (Bob Bayer, Ralph Klassa, Chris Juracek, Tom Smith and David Haack) from the March 31, 2000 layoff on April 4, 2000 (4 days); (5) one recall (Bob Bayer) from March 31, 2000 layoff who previously declined recall on April 4, 2000 and ultimately voluntarily left the company for another employment position (4 days); (6) two recalls (Andrew Timson and Arthur Klein) from March 31, 2000 layoff on May 7, 2000 (1½ months); (7) one recall (Carl Martin) from a June 7, 2000 layoff on August 15, 2000 (2 months); (8) one recall (Ronald Dallenbach) from a November 19, 1999 layoff on September 2000 (10 months); and, (9) one recall (Dmitriey Milfer) from a November 17, 1999 layoff on October 13, 2000 (11 months).

Of the individuals who accepted or declined recall, only two, Ronald Dallenbach and Dmitriey Milfer, had been laid off for more than 6 months prior to being recalled. Therefore, since these employees' termination occurred within 90 days of the March 31, 2000 layoffs (i.e., May 2000—6 months after their layoff), they should be aggregated with the forty-six that were laid off between January 4, 2000 and March 31, 2000.

Regarding the employees who declined recall (7), two originally had an effective layoff date of February 28, 2000 and the other five had a layoff effective date of March 31, 2000. Therefore, the issue be-

comes whether these seven employees suffered an "employment loss" despite being recalled, but declining.

WARN decisions have uniformly held that employees who voluntarily forego an opportunity to continue their employment do not suffer an employment loss. *Wiltz v. M/G Transport Services, Inc.,* 128 F.3d 957, 965 (6th Cir.1997) (no employment loss for employees who failed to apply for available positions or were offered employment by buyer); *Alter v. SCM Office Supplies* 906 F.Supp. 1243 (N.D.Ind.1995) (no employment loss for employees who did not seek continued employment with buyer).

Plaintiff offers no evidence that any employee was coerced to resign or decline recall. Plaintiff cites to language in the Final Rules discussing when the voluntariness of an employee's departure from a position may be called into question. However, those circumstances are not present in this case (i.e., coercion, creation of a hostile or intolerable work environment, application of undue pressure by the employer, etc.). Certainly, some employees may have declined recall because of all of the changes with Holcroft and its management, and the uncertainty of their position, but these circumstances do not constitute any intentional or coercive behavior which would justify calling into question the voluntariness of these employees' to decline recall. Therefore, the seven recalled employees who declined should be deducted from the forty eight number of employees. (i.e., 41 employees who suffered "employment loss").

■ There were six employees who were recalled and accepted. However, two of them (Dallenbach and Milfer) should be considered terminated because they had been laid off for more than six months. Therefore, the four remaining employees should also be excluded from the "employment loss" number since they do not come within its statutory and case law interpretive definition. Consequently, 4 must be subtracted from 41, leaving 37 as the new "employment loss" number.

### b. Voluntary Layoffs & Resignations

■ The record indicates that there were six voluntary layoffs from October 1, 1999 until June 15, 2000. Also, there was one resignation on June 15, 2000. For the same reasons cited above, these individuals should not be added to the thirty-seven number of employees who have suffered "employment loss."

### c. Employees on Disability Leave

■ Absent evidence of a disabled employee's ability to work, it cannot be said that a disabled employee suffered an "employment loss." *Alter,* 906 F.Supp. at 1250. Three of the individuals who were on the 3/31/00 Layoff Notice were on medical leave and were not active employees. *(See footnote 3).* Therefore, the question becomes whether they should be deducted from the 37 number since they were not active employees when they were laid off, or whether the status quo should be maintained, thereby keeping the disabled individuals included in the group of employees who have suffered an "employment loss."

The record is void of any information about the ability of these disabled individuals' ability to work. However, *Alter* states that absent evidence of a disabled employee's ability to work, it cannot be said that a disabled employee suffered an "employment loss." *Alter, supra.* Plaintiff has not provided any evidence regarding the status of these allegedly disabled employees.

Moreover, the case law cited by Plaintiff is unpersuasive for the reason that the employees in this case were disabled before the series of layoffs took place. The court in *Local 819, Int'l Bhd of Teamsters*

*v. Textile Deliveries, Inc.,* No. 99CIV.1726(JGK), 2000 WL 1357494 at \*6 (S.D.N.Y.2000), cited by Plaintiff, was confronted with a situation where the employees were actively working at the time the plant closed and applied for workers compensation benefits after the closing. Unlike the employees in *Textile,* the Holcroft employees were on disability leave prior to the March 31, 2000 layoffs. The Court finds that absent evidence of their ability to work, these employees could not have suffered an "employment loss" as a result of their layoff and consequently cannot be included in Plaintiff's "employment loss" number, but rather must be deducted, making the new number 34 [30].

■ Even assuming that these disabled employees were added, it would be of no moment in that the addition of the disabled employees would not give Plaintiff the requisite number (i.e., 50) of employees to trigger the WARN notice requirements.

Therefore, the Court finds that Plaintiff has not met the requisite number, required under WARN, of employees suffering from "employment loss" as a result of the sale of Holcroft's assets on March 31, 2000. Consequently, Defendants were not obligated to give the subject employees 60 days notice prior to the effective date of their respective layoffs.

### 3. Liability of "Employer" Defendants

Since the Court finds that less than 50 employees suffered an employment loss within a 90-day period, the resolution of joint liability among Holcroft, Atmosphere,

Madison Capital and AFC–Holcroft, is moot.

## V. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment is **DENIED.** Defendants' Motion for Summary Judgment is **GRANTED,** and this matter is dismissed.

**IT IS SO ORDERED.**

---

**30.** Defendants maintain that the number of employees who suffered "employment losses" was 23. Part of the discrepancy is their assertion that 30 employees were laid off on 3/31/00, when it was 35. Perhaps they may have given double credit to some other employees for being laid off and then deducted twice from the "employment loss" number because a few employees got laid off, recalled and laid off again. Carl Martin, Bob Bayer and Roger Minton are examples of that type of back and forth employment. However, even with these discrepancies, at least 50 employees have not suffered an "employment loss."